22-6247, 23-6289
*Wassily v. Bondi; Velasquez Arreaga v. Bondi*

BETH ROBINSON, *Circuit Judge*, dissenting:

By statute, "The Secretary of Homeland Security or the Attorney General . . . may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum" who meets various requirements. 8 U.S.C. § 1159(b). At issue is whether a noncitizen who was granted asylum which was later terminated qualifies as "any alien granted asylum" eligible to apply for adjustment to lawful permanent resident ("LPR") status if otherwise qualified. *Id.*

This is a difficult case, as reflected by a circuit split on the question. *See Siwe v. Holder*, 742 F.3d 603, 608, 612 (5th Cir. 2014) (concluding based on the "plain language of the statute" that a noncitizen whose asylum has been terminated is eligible to apply for adjustment of status under § 1159(b)); *Cela v. Garland*, 75 F.4th 355, 364–65 (4th Cir. 2023) (concluding that "§ 1159(b) unambiguously precludes [a noncitizen] whose asylum status has been terminated from adjusting to lawful permanent resident status"). But in my view, the majority gets it wrong.

The text of the statute supports the conclusion that a noncitizen granted asylum is not categorically ineligible to seek adjustment of status under § 1159(b) following termination of the asylum. Most importantly, the statute expressly includes continuing status requirements where applicable, and it does not apply

one to individuals "granted asylum." 8 U.S.C. § 1159(b). Moreover, the statutory scheme relating to adjustment of status—particularly Congress' allocation of discretion to waive certain disqualifications in the adjustment-of-status process—reinforces this conclusion. For these reasons, as explicated more fully below, I conclude that the best understanding of § 1159(b) is that it encompasses "any" noncitizen "granted asylum," regardless of whether the asylum was subsequently terminated. *Id.*

## I.     Statutory Text

Like the majority, I begin with the text of the statute. *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) ("Every exercise in statutory construction must begin with the words of the text.").[1] Unlike the majority, I don't think the "more natural reading" of the phrase "any alien granted asylum" is that it excludes noncitizens granted asylum where that asylum has subsequently been terminated. Maj. Op. at 17. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)); *see also Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 220 (2008) ("Congress' use of

---

[1] In quotations from caselaw and the parties' briefing, this dissent omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind.").

Plus, if Congress had intended "any alien granted asylum" to mean "any asylee," or any noncitizen "who continues to be subject to asylum protections," it could have said so. "Nowhere in this section does Congress require that [a noncitizen's] asylum, once granted, still must be in effect at the time [the noncitizen] applies for adjustment of status: Such a requirement is conspicuously absent. To conclude otherwise would be to contravene the Supreme Court's exhortation that we add no unwritten requirements to the text." *Siwe*, 742 F.3d at 608; *see also Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *compare* 8 U.S.C. § 1159(b) ("The Secretary of Homeland Security or Attorney General . . . may adjust . . . the status of any individual granted asylum"), *with* Maj. Op. at 17 ("[G]ranted asylum" means "presently be granted asylum").

But I would not hang my hat on a bare assessment of the contested phrase standing alone. In interpreting the text of a statute, we don't consider the specific terms at issue "in isolation." *King*, 894 F.3d at 477. "[R]ather, we look to the

statutory scheme as a whole and place the particular provision within the context of that statute." *Id.*

A review of § 1159 tells us in no uncertain terms that when Congress intended to require continuity of a predicate status as a precondition to adjustment to LPR status, it said so in plain terms. And it did not do so in § 1159(b)'s provision authorizing "any alien granted asylum" to apply for adjustment of status. Instead, the statute expressly requires that noncitizens who are granted asylum and then seek to adjust to lawful permanent resident status maintain their status as *refugees*, not their status as *asylees*. Before drilling down further on these points, I step back briefly to provide an overview of the relevant scheme.

The Immigration and Nationality Act ("INA") establishes distinct paths to admission for refugees admitted to the United States from foreign countries pursuant to 8 U.S.C. § 1157 and those who apply for and are granted asylum while in the United States pursuant to § 1158. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987).[2] As relevant here, the term "refugee" includes "any person who is outside any country of such person's nationality . . . who is unable or unwilling to

---

[2] We refer here to the statutory codifications of the INA, as amended by the Refugee Act of 1980. Section 1157 of Title 8 codifies INA § 207; section 1158 codifies INA § 208; and section 1159 codifies INA § 209. *See* Refugee Act of 1980, Pub. L. 96-212, sec. 201, §§ 207–209, 94 Stat. 102, 103–105 (1980).

return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

The grounds for *terminating* the status of refugees admitted pursuant to § 1157 and those granted asylum pursuant to § 1158 are likewise distinct.  The refugee status of a noncitizen admitted pursuant to § 1157 may be terminated "if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 1101(a)(42) . . . at the time of . . . admission."  *Id.* § 1157(c)(4).  But a noncitizen granted asylum pursuant to § 1158 may lose that asylum protection if the Attorney General determines the individual no longer meets the definition of a refugee, committed certain offenses or is a danger to the country, firmly resettled in another country, may safely be removed to another country by agreement, availed themselves of the protection of their country of origin, or acquired new nationality and "enjoys the protection" of their new country.  *Id.* § 1158(c)(2).  In short, the bases for terminating asylum status under § 1158 are far broader than the bases for terminating the refugee status of noncitizens admitted pursuant to § 1157, and individuals who still qualify as *refugees* may nevertheless

lose the protection of *asylum* under § 1158 for reasons unrelated to whether they face persecution in their country of origin.

Finally, and most relevant here, refugees admitted under § 1157 and those granted asylum under § 1158 follow different routes to LPR status. *See id.* § 1159. Section 1159(a) establishes a path to lawful permanent resident status for any noncitizen admitted to the United States under § 1157—

> (A) whose admission *has not been terminated* by the Secretary of Homeland Security or the Attorney General pursuant to such regulations as the Secretary of Homeland Security or the Attorney General may prescribe,
>
> (B) who has been physically present in the United States for at least one year, and
>
> (C) who has not acquired permanent resident status.

*Id.* § 1159(a)(1) (emphasis added).

By contrast, with respect to noncitizens granted asylum under § 1158,

> The Secretary of Homeland Security or the Attorney General . . . may adjust to the status of an alien lawfully

6

admitted for permanent residence the status of any alien granted asylum who—

(1) applies for such adjustment,

(2) has been physically present in the United States for at least one year after being granted asylum,

(3) *continues to be a refugee* within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,

(4) is not firmly resettled in any foreign country, and

(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter *at the time of examination* for adjustment of such alien.

*Id.* § 1159(b) (emphases added).

Review of the statutory section at issue here, § 1159, thus teaches us that Congress can and does specify when a noncitizen must maintain a predicate status in order to be potentially eligible for adjustment of status. It did so *three times* within § 1159. In § 1159(a) it expressly limited the path to lawful permanent resident status to a noncitizen admitted under § 1157 "whose admission *has not been terminated*." *Id.* § 1159(a)(1) (emphasis added). And in § 1159(b) it limited the path to lawful permanent resident status for a noncitizen granted asylum to a noncitizen who "continues to be a refugee" and is admissible "at the time of examination." *Id.* §§ 1159(b)(3), 1159(b)(5). When "Congress includes particular

language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Mahdawi v. Trump*, 136 F.4th 443, 454 (2d Cir. 2025).

To steal an apt summary from Judge Harris, dissenting in *Cela v. Garland*:

> This was not just a Congress that knew how to say—if it wanted to—that a noncitizen once granted asylum would remain eligible for adjustment only if he "continued to be" an asylee, *cf.* § 1159(b)(3), or if he was an asylee "at the time of examination for adjustment of status," *cf.* § 1159(b)(5). This was a Congress downright preoccupied with the timing question in front of us now, and against that background, its failure to specify that asylee status must be current under § 1159(b) can only be understood as a purposeful omission.

75 F.4th at 367 (Harris, J., dissenting).

This understanding is bolstered by the Department of Justice's implementing regulations, which specify that § 1159(b) applies to any individual "who *has been* granted asylum," rather than to any individual who is currently protected by asylum. 8 CFR § 1209.2(a)(1) (emphasis added); *see also D.S. by and through M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 163 (2d Cir. 2020) (explaining

8

that a statute's implementing regulations may "support[]" the "clear" language of a statute).

That doesn't mean that all bets are off once an individual is granted asylum, regardless of subsequent termination of that protection. But the critical *continuing* status for purposes of adjustment to lawful permanent resident status under § 1159(b) is the noncitizen's continuing status as a *refugee*. And, of course, the individual whose asylum has been terminated but who is eligible to apply for adjustment of status must still qualify for the adjustment in all other respects, including satisfying the requirements for admissibility. 8 U.S.C. § 1159(b)(5).

Contrary to the BIA's suggestion in its own analysis of the central question in this case, this understanding of the statute does not give individuals who were granted and then lost their asylum an incongruous advantage over refugees admitted pursuant to § 1157 whose refugee status has been terminated. *See Matter of T-C-A-*, 28 I. & N. Dec. 472, 479–80 (B.I.A. 2022). Remember, the only statutory basis for revoking the refugee status of an individual admitted under § 1157 is that the noncitizen "was not in fact a refugee" when they were admitted. 8 U.S.C. § 1157(c)(4). Requiring continuity of status under these circumstances thus guards against granting an LPR status adjustment to individuals who didn't actually qualify as refugees upon admission. By contrast, individuals granted asylum

9

under § 1158 can lose that status for a host of reasons unrelated to their status as refugees.  *See id.* § 1158(c)(2).  Given that, it is not at all incongruous to allow individuals whose asylum has been terminated to seek adjustment to LPR status; in doing so, they still have to establish that, asylum or not, they continue to be *refugees.  See id.* § 1159(b)(3).

I don't deny that some textual breadcrumbs in the statutory structure could lead to a different conclusion.  The majority has highlighted them here—the notion that once someone's asylum is revoked they have no "status" to adjust, and the use of "granted asylum" to suggest a present status in § 1158(c).  Maj. Op. at 17–19.  That's what makes this a hard case.  But in my view, the specific inclusion of multiple continuity requirements in the very same statutory section as the phrase

at issue here coupled with the omission of such a requirement with respect to individuals "granted asylum" overwhelms these other textual clues.[3]

## II.     Statutory Scheme

My understanding of the statute also jibes better with the broader statutory scheme by maintaining the balance Congress struck in affording the Attorney General or the Secretary of Homeland Security discretion to waive certain grounds of inadmissibility in considering requests for adjustment of status—including

---

[3] The majority also leans on a statutory note in the Immigration Act of 1990 regarding § 1159. The note, titled "Adjustment of Certain Former Asylees," provides that the adjustment provision of 8 U.S.C. § 1159(b) "shall also apply to an alien . . . who was granted asylum before the date of the enactment of this Act (regardless of whether or not such asylum has been terminated under [8 U.S.C. § 1158])" and "who is no longer a refugee because of a change in circumstances in a foreign state." Pub. L. No. 101–649, sec. 104(d), 104 Stat. 4978, 4985 (1990). The Act also increased the then-existing cap on adjustments of status under § 1159(b) from 5,000 to 10,000. *Id.* sec. 104(a)(1). The majority interprets this note as expanding the reach of § 1159(b) to noncitizens whose asylum has been terminated on a time-limited, one-off basis, signaling that the default understanding is that § 1159(b) is available only to individuals who continue to be protected by asylum. Maj. Op. at 22–23. This inscrutable note clearly *does* create a one-time exception to the ordinary operation of § 1159(b) for individuals who are no longer *refugees* due to a change of circumstances in the countries from which they have taken refuge. But as to the parenthetical cited by the majority, it seems just as plausible that Congress recognized that noncitizens who have been granted asylum may be eligible for adjustment of status *whether or not their status has been terminated*, and accordingly sought to clarify that § 1159(b) applies to all noncitizens granted asylum *before the date of the 1990 Act*, even if their status was terminated before that date. In the end, this data point doesn't move the needle.

grounds based on many criminal convictions—in order to assure family unity or promote the public interest.

Again, an overview.  Subject to an exception, one of the requirements for awarding LPR status to a noncitizen "granted asylum" is that the noncitizen be "admissible."  8 U.S.C. § 1159(b)(5).  Section 1182(a) lists classes of noncitizens who are inadmissible.  *See id.* § 1182(a).  The exception to this admissibility requirement is set forth in § 1159(c), which makes some grounds of inadmissibility under § 1182(a) inapplicable to requests for adjustment of status under § 1159, and confers on the Secretary of Homeland Security and the Attorney General the discretion to waive most other grounds of inadmissibility under § 1182(a), including inadmissibility based on many criminal convictions, in order to promote humanitarian purposes, family unity, or the public interest.  *See id.* § 1159(c); *see also id.* § 1182(a)(2) (identifying criminal convictions that can lead to inadmissibility).  So Congress' scheme expressly contemplates that some noncitizen refugees with criminal convictions, including for potentially serious crimes, may nevertheless be eligible for LPR status, and it empowers the Attorney

General or Secretary to weigh the public interest, including the interest in family unity, against an otherwise disqualifying conviction.

The majority's interpretation deprives the Attorney General or Secretary of that discretion in cases in which asylum has been terminated. So noncitizens like Petitioners here, who lose their asylum due to conviction for a "particularly serious crime," *id.* §§ 1158(c)(2)(B),1158(b)(2)(A)(ii), would be *categorically* ineligible for adjustment to LPR status, and the Attorney General and Secretary would have no discretion to make an exception in the public interest. That's true even though the same noncitizens would be eligible to seek LPR status notwithstanding those convictions, and the Attorney General and Secretary would have discretion to make an exception in the public interest, if the noncitizens' asylum had not been terminated. It's an incongruous result.

And it means that the Attorney General's and Secretary's authority to grant LPR status, and the options available to a noncitizen asylee facing termination of asylum even though the noncitizen remains a refugee, depend entirely on the order in which the two petitions—for termination of asylum and for adjustment of status—are considered. That, too, is incongruous.

As it turns out, the better interpretation based on the text of the statute also best preserves the balance Congress struck by affording the Attorney General and

13

Secretary discretion to extend LPR status to noncitizens who are refugees who have committed crimes that might otherwise be disqualifying.

The majority suggests that this interpretation "makes little sense" because it leaves noncitizens whose asylum has been terminated on account of a criminal conviction in the same shoes as noncitizens with asylum. Maj. Op. at 24. But in an important respect, these two categories of noncitizens do stand in the same shoes: both have been found to be refugees. To the extent that the two classes differ—members of one group have been convicted of particularly serious crimes—the statutory structure takes account of that fact: Most noncitizens who have been convicted of particularly serious crimes are presumptively inadmissible and thus ineligible for adjustment of status, 8 U.S.C. §§ 1159(b)(5), 1182(a)(2), *unless* their crimes of conviction fall within the class of crimes for which inadmissibility may be waived for purposes of adjustment of status, and *unless* the Attorney General or Secretary chooses to waive that inadmissibility "for humanitarian purposes, to assure family unity, or . . . in the public interest," *id.* § 1159(c). There is nothing insensible about that structure. Insofar as it aligns with Congress' intent on multiple axes, and retains Executive Branch discretion to promote family unity, humanitarian goals, and the public interest, it makes far

more sense than a reading that categorically strips the Attorney General and Secretary of their discretion.

*      *      *

For these reasons, I conclude that § 1159(b) provides a mechanism for refugees granted asylum pursuant to § 1158 to adjust to LPR status regardless of whether their asylum has been terminated—as long as they remain refugees and otherwise qualify for adjustment to LPR status.  Accordingly, I respectfully dissent.